# IN THE MATTER OF CARLOS TAPIA.

ON APPLICATION FOR HABEAS CORPUS.

Re Grand Jury In Porto Rico Local Courts.

Constitutional Law—Organization—Incorporation.

1. The organization of a territory generally, but not necessarily, consists of putting it under a government with the usual three departments. Incorporation of territory into the United States consists of making the people a part of the Union, instead of a possession of the Union. The process relates to the land, the people, and the rights conferred. This process began at least with the Declaration of Independence, when the inalienable rights of man were declared to be life, liberty, and the pursuit of happiness, governments being instituted to secure them. The grand jury was one of these colonial institutions. Under the Confederation, among the personal rights were religion, habeas corpus, trial by jury, and representative government. The extension of the country began with the Northwest Territory, settled principally by Americans, and being within the original limits of the United States. The Ordinance of 1787 for this territory furnished the model for all subsequent territories, and among the rights provided for are habeas corpus, trial by jury, and judicial proceedings according to the course of the common law.

Constitutional Law—Constitution—Fundamental Rights.

2. To the Constitution adopted in 1787 was added a Bill of

. In the Matter of Tapia.

Rights, and in Amendment 5 was that "no person shall be held to answer for . . . . an infamous crime unless on a present-ment or indictment by a grand jury." While the essential rights of man may be differentiated from the rights of an American, wherever the Constitution applies we are concerned only with the rights provided for therein, among which are jury and grand jury.

Constitutional Law—Territory South of the Ohio River—Rights.

3. The same rights applied South of the Ohio river as in the Northwest Territory according to acts of Congress creating ter-ritories in that district. The territorial system thus developed in the original Union east of the Mississippi carried with it a system of general institutions, but accommodating themselves to special local needs.

Constitutional Law—Louisiana Purchase—Orleans.

4. The Louisiana Purchase Treaty of 1803 promised the in-corporation of the inhabitants into the Union and admission to all rights, advantages, and immunities of citizens of the United States, they meantime enjoying their liberty, property, and re-ligion. The beginning of such incorporation into the Union was the creation of the territories of Orleans and Louisiana (afterwards Louisiana and Missouri), to which general statutes of the United States were extended and for which the grand jury was contem-plated, and the completion of incorporation was the granting of citizenship at the admission of the states of Louisiana and Missouri.

Constitutional Law—Acquisition of Florida—Territory.

5. Similarly the Florida Treaty of 1819 was a promise which as to incorporation of the district was fulfilled by the creation of the territory and as to citizenship by the admission of that state.

Constitutional Law—Texas and Mexican Treaty.

6. Texas was annexed and citizenship thereby extended, and the Mexican acquisitions were incorporated by extending the American boundary southwardly so as to embrace them.

Constitutional Law—Citizenship—States.

7. Citizenship is the sum of the rights, privileges, immunities, and advantages of those making up the sovereign people. A citizen of a state was and is necessarily a citizen of the United States, but before the 14th Amendment there was no citizenship of the United States apart from citizenship of some individual state. Under the Constitution there are only two sources of citizenship, birth and naturalization, the latter individual or collective, by the general or by special law.

### In the Matter of Tapia.

**Territories West of the Mississippi—Government—Indians.**

8. The territories west of the Mississippi river thus incorporated gradually grew into a regular system, to which separately and afterwards by Revised Statutes the Constitution and laws not locally inapplicable were extended. While the Indians were not subject to individual naturalization, many tribes have been collectively naturalized, and others lived in the unorganized Indian Territory, which ultimately was made subject to the Constitution and admitted as part of the state of Oklahoma. All the contiguous territories were parts of the Union with right to control local matters, but themselves under the absolute control of Congress.

**14th Amendment—Alaska Treaty—Incorporation.**

9. The 14th Amendment created national citizenship, and Alaska was acquired under it. The inhabitants were shortly recognized by Congress as admitted to all the rights, advantages, and immunities of citizens of the United States. This was incorporation into the Union and the Constitution applied proprio vigore, beyond the power of Congress to change it, but Congress as the local legislature could make a difference between Alaska and the rest of the Union in tax matters so far as the proceeds were used exclusively for local purposes.

**Hawaii—Annexation—Preparation.**

10. The annexation of Hawaii did not carry with it incorporation and citizenship until the territorial form of government was instituted, and in the meantime the rights of man, and not the historical rights of Americans, were enforceable.

**Treaty of Paris—Philippines—Not Incorporated.**

11. The Treaty of Paris 1898 passed to the United States the sovereignty of the Philippines and Porto Rico, but instituted a new territorial policy in that it contained no promise of incorporation of the new possessions into the Union. Congress accordingly has determined the civil rights and political status of the Philippines by keeping them a "possession" not "incorporated into the Union." The grand jury and other constitutional American rights as distinguished from the rights of man do not apply there.

**Same—Porto Rico—Foraker Act 1900.**

12. The Foraker Act of 1900 conferred many privileges of a territory on Porto Rico, both of form and substance, but did not effect full incorporation of land or people into the Union.

**Same—Porto Rico—Jones Act 1917.**

13. The Jones Act still withholds the title "territory," but the

In the Matter of Tapia.

use for Porto Rican purposes of general revenues collected in Porto Rico is not inconsistent with Porto Rico being a territory. The territorial system is flexible enough to meet any difficulties connected with Americanization of "possessions."

Porto Rico—Jones Act—Citizenship.

14. Incorporation is legally that of the people and that of the land or district is only for the benefit of the people. The latter grants a quasi citizenship; general incorporation and citizenship are almost synonymous. Porto Ricans are fully Americans and fully incorporated into the Union, with the inalienable right of grand jury and with all other constitutional rights.

Habeas Corpus—Machinery for Grand Jury—Personal Rights.

15. The Legislature could have passed a law for a grand jury, and an American cannot be deprived of his rights because of supposed public convenience; but as a new legislature is about to come into being the execution of the writ in this case will in the discretion of the court be postponed three months to give the authorities opportunity to correct the oversight, and petitioner released on bail.

Opinion filed May 21, 1917.

*Messrs. F. H. Dexter, Enrique Campillo, Paul Charlton,* and *Willis Sweet* for petitioner.

*Mr. José Quiñones* for respondent.

*Mr. Howard L. Kern,* Attorney General, and *Mr. George S. Brengle,* Assistant Attorney General, for People of Porto Rico and respondent.

HAMILTON, Judge, delivered the following opinion:

The facts and pleadings in this matter are stated in a pre-

vious opinion of the court on preliminary motions connected with this application for habeas corpus, under Rev. Stat. § 753, Comp. Stat. 1916, § 1281. The matter now comes on for decision upon the merits, the situation being that the petitioner, Carlos Tapia, was at the time of the application in the custody of the respondent herein under a commitment by the Honorable José Benedicto of the local district court of San Juan to await trial for the alleged offense of assault with intent to murder, without any indictment having been found against him by a grand jury. The point in the case, therefore, is whether under the Jones Act of March 2, 1917 (the present Organic Act of Porto Rico), Amendment 5 of the Constitution applies, requiring that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury."

The political condition of Porto Rico was declared by the Supreme Court of the United States in what are called the Insular Cases, Downes v. Bidwell, 182 U. S. 1, 45 L. ed. 1041, 21 Sup. Ct. Rep. 743, and decisions, such as the Didricksen Case, 227 U. S. 145, 57 L. ed. 456, 33 Sup. Ct. Rep. 224, since that time. The effect is that what is called the Foraker Act of April 12, 1900, "An Act Temporarily to Provide Revenue and a Civil Government for Porto Rico and for Other Purposes" (31 Stat. at L. 77, chap. 191), made Porto Rico an organized territory of the United States, but one not incorporated into the Union, with the result that the Constitution of the United States applied only so far as it was expressly made applicable by legislation of Congress. Under that act the Legislative Assembly of Porto Rico could have passed a law for a grand jury, but it did not do so. On the other hand, the new Organic

Act of March 2, 1917, entitled, "An Act to Provide a Civil Government for Porto Rico and for Other Purposes," made certain changes in the organic law, including grant of citizenship, and to it is prefixed a Bill of Rights naming almost all the constitutional rights except that of a grand jury, and not in terms denying it. Upon the question whether this effects the incorporation of Porto Rico into the Union depends whether or not the petitioner, Carlos Tapia, is unlawfully restrained of his liberty by being denied the right of a grand jury under Amendment 5. Does the Constitution, in other words, apply to Porto Rico?

In his dissenting opinion in the Insular Cases Mr. Justice Harlan, one of the acutest minds ever on the bench, said, "I am constrained to say that this idea of 'incorporation' has some occult meaning which my mind does not apprehend. It is enveloped in some mystery which I am unable to unravel." It is important, therefore, to understand its meaning. There has been no definition of the process, and indeed all definitions are dangerous, as has been shown from the time of Plato's definition of man down to the attempts to define equity. Thus, great chancellors have declared that it would be unwise to define, for instance, such a pervasive subject as fraud. So, as to political matters, when District Judge Parker defined a territory as an "inchoate state," with certain qualities (Ex parte Morgan, 20 Fed. 298, 305), and this definition was apparently approved by the Supreme Court (Re Lane, 135 U. S. 443, 34 L. ed. 219, 10 Sup. Ct. Rep. 760), that court itself was constrained afterwards to declare that the important executive element named was unnecessary. Rassmussen v. United States, 197 U. S. 516, 49 L. ed. 862, 25 Sup. Ct. Rep. 514. Description is probably better than definition, and indeed this is the Anglo-Saxon prac-

In the Matter of Tapia.

tice.   While the Civil Law has from the time of Justinian if
not of Gaius, attempted, and with much success, to define every-
thing, the common law, like its Anglo-Saxon founders, decides
cases or passes laws pro re nata, for matters only as they come
up.

   . While the word "organization" as meaning a regular govern-
ment, generally of three departments, is found in enactments
from an early period, "incorporation" is rather a treaty than a
legislative word.   It is perhaps still used in the generic sense
as when Mr. Justice Story in an article on admiralty jurisdic-
tion in 1829 speaks of the incorporation of nations into the
Roman Empire.   Story's Miscellanies, p. 248.   In the Insular
Cases Mr. Justice White, now Chief Justice White, describes
incorporation as making the people in question a part of the
American family.   182 U. S. 339, 45 L. ed. 1126, 21 Sup. Ct.
Rep. 770.   It is, properly speaking, making a district a part of
the United States instead of a possession of the United States.
It must be noticed that the process applies essentially to the
people, rather than the land on which they live.   The process
relates at least to three things,—the land or territory, the inhabi-
tants or people, and the rights, whether national or individual,
which are conferred upon them or recognized by national legis-
lation.   To understand the case at bar it is necessary to con-
sider the subject of these rights and then the instances in which
incorporation has been effected and citizenship declared in
American history.   This embraces the Northwest Territory of
colonial times, then, under the Constitution, the Louisiana,
Florida, and Mexico Purchases, and last the treaties for non-
contiguous acquisitions such as Alaska, Hawaii, and from Spain.

In the Matter of Tapia.

## Colonial Rights and Territories.

1. The development of the United States began with the assertion of rights within the limits of the original thirteen colonies, each having its own citizens; the territory and people outside came to be considered only later. The Declaration of Independence declares "that all men are created equal, that they are endowed by their Creator with certain inalienable rights, that among these are life, liberty, and the pursuit of happiness. That to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed." Further than this, these rights are not defined except negatively in what the King of Great Britian denied, and these are mainly connected with representative government and with the use of troops, including "depriving us in many cases of the benefit of trial by jury." Although not specially mentioned, the grand jury was one of the colonial institutions, coming down from remote times in English history. Pollock & M. History of English Law, 638, 646. No distinction was made between human and civil rights. Indeed there never has been an exact definition of the fundamental or essential rights any more than there has been of the essential duties of man.

An attempt at corporate existence of the United States had already begun the month before the Declaration, with the appointment of a committee to prepare a form of confederation. The Articles of Confederation reported in 1777 were transmitted to the states and gradually adopted, and Congress assembled under the new powers on March 2, 1781. The Confederacy was called the United States of America, each state retaining its sovereignty, freedom, and independence, and every power, jurisdiction, and right not expressly delegated, although it was de-

### In the Matter of Tapia.

clared to be a firm league of friendship for common defense, security of liberties and mutual and general welfare.[1]

This "Union shall be perpetual," subject to amendment by all the states. On the subject of personal rights the Articles of Confederation mentioned religion, habeas corpus, trial by jury, and representative government.

The charter limits of the different colonies conflicted and were a subject of dispute, although the western boundary of the new country was limited to the Mississippi river by the treaty of peace with Great Britain in 1782, acknowledging the independence of the states. The claims of the colonies to these western lands were gradually ceded to the Confederation, upon the initiative especially of Virginia, the largest proprietor, and this transferred to the Confederate management the territory northwest of the Ohio river. This was the first step of America towards "making the world safe for democracy," but it was in

---

[1] Article 4 declared that "the better to secure and perpetuate mutual friendship and intercourse among the people of the different states in this Union, the free inhabitants of each of these states . . . shall be entitled to all privileges and immunities of free citizens in the several states; and the people of each state shall have free ingress and regress . . . and shall enjoy therein all the privileges of trade and commerce." Extradition was provided for, and "full faith and credit shall be given in each of these states to the records, acts and judicial proceedings of the courts and magistrates of every other state," prohibitions declared on states as to alliances and war powers, and taxes for general purposes were to be laid and levied by authority of the several legislatures. There was no Supreme Court, the Congress being given certain jurisdiction. The United States shall "have the sole and exclusive right and power" as to coin, weights, and measures, trade with the Indians, postoffice, and as to armies and navies. A committee of states acted when Congress was not in session, and other machinery of government and war was established. The accession of Canada was contemplated, but no other colony could be added unless agreed to by the nine states, which might be said to be a constitutional quorum for many acts.

territory already a part of the country by the treaty of peace with Great Britain, the former sovereign, and by cession of the several states, the former proprietors. There was no citizenship there except that of these states.

Legislation with regard to this territory began in 1784, but more especially with the Act of the Confederate Congress July 13, 1787, entitled, "An Ordinance for the Government of the Territory of the United States Northwest of the River Ohio." The said territory was ordained for the purpose of temporary government to be one district, and § 2 of the ordinance provided for simple civil rights and remedies of resident and nonresident proprietors in the said territory, including wills, descents, and conveyances, subject to alteration by the legislature of the district. The government consisted of a governor, secretary, and judges, the governor and judges being the legislature, reporting to Congress from time to time the laws adopted. When the population amounted to 5,000 free male inhabitants of full age a representative legislature should be elected, to consist of "citizens of any of the United States," owning land and residing in the district. The general assembly thereafter was to consist of the governor, legislative counsel, and house of representatives, the council being appointed by the Congress. This Legislature "shall have authority to make laws, in all cases, for the good government of the district, not repugnant to the principles and articles in this ordinance established and declared." [1 Stat. at L. 52, note.] A delegate to Congress was elected by the Legislature. This ordinance contemplated the establishment of states to be admitted "to a share in the Federal councils on an equal footing with the original states at as early periods as may be consistent with the general interest." Cer-

### In the Matter of Tapia.

tain provisions were declared to be articles of compact "between the original states and the people and states in the said territory, and forever remain unalterable unless by common consent," six in number and relating: 1, to free religion; 2, to habeas corpus, trial by jury, "judicial proceedings according to the course of the common law," bail, moderate fines, judgment of one's peers, the law of the land, ex post facto laws, all as they had come down from English history; 3, as to schools, and means of education were to be encouraged; 4, says the said territory and the states which may be formed therein shall forever remain a part of this Confederacy of the United States of America, provides for "the primary disposal of the soil by the United States," taxation, nonresident proprietors to be taxed at the same rate as residents, and navigable waters and carrying places should be common highways and forever free; 5, provided for not less than three nor more than five states, whose boundaries were described but unnamed, "and whenever any of the said states shall have 60,000 free inhabitants therein, such state shall be admitted, by its delegates, into the Congress of the United States, on an equal footing with the original states, in all respects whatever; and shall be at liberty to form a permanent Constitution and state government: Provided, the Constitution and government, so to be formed, shall be Republican, and in conformity to the principles contained in these articles." 6, provides that "there shall be neither slavery nor involuntary servitude in the said territory, otherwise than in the punishment of crimes, whereof the party shall have been duly convicted," with a provision as to fugitives.

On the one hand it has been said by Chief Justice Taney in Scott v. Sandford, 19 How. 438, 15 L. ed. 714, that this ordi-

In the Matter of Tapia.

nance became inoperative upon the adoption of the Constitution in the same year, and on the other hand, as held by Mr. Justice Baldwin in Pollard v. Kibbe, 14 Pet. 417, 10 L. ed. 521, the ordinance was the most solemn of all engagements and became a part of the new Constitution by that provision of the 6th article providing that "all engagements entered into before the adoption of this Constitution shall be as valid against the United States under this Constitution as under the Confederation." See also Strader v. Graham, 10 How. 98, 13 L. ed. 343.

### Rights Under Constitution.

2. Independence had been achieved, but for many purposes the Confederation proved a rope of sand. In 1785 alterations were recommended in Congress, and the next year Virginia provided for commissioners to consider an act to provide for the trade and commerce of the United States. This trade convention at Annapolis led to the Constitutional Convention which met in Philadelphia in 1787 under a resolution of Congress, acted upon by seven states. The work of this convention was declared in the preamble, as follows:

"We the People of the United States, in order to form a more perfect Union, establish justice, insure domestic tranquility, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this Constitution for the United States of America."

This great instrument consists largely of machinery of the new government, article 1, relating to Congress, article 2 to President, and article 3 to the Judiciary, with provisions in

PORTO RICO

In the Matter of Tapia.

three other articles as to ratification and amendment of the Constitution.[1]

At the demand of states ratifying the new Constitution certain amendments were proposed by Congress in 1789 and ratified shortly thereafter, making up what is commonly called the

(1) Provisions as to the Union are that "full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state (art. 4, § 1). . . . The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states" (art. 4, § 2), both of these being taken from the Confederation. Provisions as to extradition are found in art. 4, § 2. Then in article 4, § 3. "The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." "The United States shall guarantee to every state in this Union a republican form of government" (art. 4, § 4)., that all debts contracted and engagements previously entered into shall be valid against the United States under this Constitution, and that "this Constitution, and the laws of the United States which shall be made in pursuance thereof: and all treaties made . . . under the authority of the United States shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding." (art. 6.)

Congress was given power to legislate on the following subjects: Taxation, duties, imposts and excises, all duties, imposts and excises to be uniform throughout the United States; to borrow money, "to regulate commerce with foreign nations and among the several states," to establish an uniform rule of naturalization, and uniform laws on the subject of bankruptcies to coin money, provide against counterfeiting, to establish post-offices and post roads, to secure authors and inventors by copyrights and patent rights, to provide armies and navies, and control foreign affairs, with power "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all powers vested by this Constitution in the government of the United States." These powers, however, were limited by prohibitions against suspension of habeas corpus, bills of attainder and ex post facto laws, direct taxes except in proportion to the census, export duties, preference to ports, and titles to nobility. There were prohibitions also upon the states as to alliances, letters of marque, coining of money, bills of attainder, ex post facto laws and laws impairing the obligation of contracts, granting title of nobility, and impost, tonnage, or other duties.

Bill of Rights, and cover: 1, Religion, freedom of speech, assembly, and petition; 2, Militia and the right to bear arms; 3, as to quartering soldiers; 4, unreasonable searches; 5, the one important in the case at bar, "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a present' ment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." Art. 6, provides trial by petit jury, confronting with witnesses, compulsory process for witnesses, and assistance of counsel; 7, jury in common-law suits exceeding $20; 8, moderate bail and punishment. Other amendments were added relating to the machinery of the government.

As showing contemporary thought it might be noted that in 1789 the French National Assembly declared "in the presence of the Supreme Being, and with the hope of His blessing and favor, the following sacred rights of men and of citizens: 1. Men are born and always continue free and equal in respect of their rights. Civil distinction, therefore, can only be founded on public utility. 2. The end of all political associations is the preservation of the natural and imprescriptible rights of man; and these rights are liberty, property, security, and resistance of oppression. 3. The nation is essentially the source of all sovereignty; nor can any individual or any body of men be entitled to any authority which is not expressly derived from·

### In the Matter of Tapia.

it." Thomas Paine declares these three contained all the rights of man, and that the fourteen other items which succeed either originate out of the first three or follow as elucidations. Rights of Man, pp. 112–114. Naturally a grand jury found no place in that system, as it was an English development, but we find in 7: "No man shall be accused, arrested, or held in confinement, except in cases determined by the law, and according to the forms which it has prescribed." The French view was afterwards crystallized into "liberty, equality, and fraternity," but the last is an aspiration rather than a right, and the Anglo-Saxon method has always been to establish concrete rights rather than theories, and work rights into lasting institutions. Possibly the shrewdest investigator of American institutions was de Tocqueville in 1831, and he discovered that American liberty rests upon institutions. De Tocqueville does not discuss the grand jury in particular, but he says the jury as a judicial institution "appears to me to be the least part of the subject. The jury is pre-eminently a political institution; it must be regarded as one form of the sovereignty of the people; when that sovereignty is repudiated, it must be rejected; or it must be adapted to the laws by which that sovereignty is established. The jury is that portion of the nation to which the execution of the laws is intrusted; . . . the list of citizens qualified to serve on juries must increase and diminish with the list of electors." Democracy in America, New York 1848, p. 310. Lieber declares Anglo-Saxon liberty to rest on these institutions which had been established in English historical development. Civil Liberty, 324. In Downes v. Bidwell, 182 U. S. 282, 45 L. ed. 1104, 21 Sup. Ct. Rep. 770, Mr. Justice Brown considers among essential or fundamental rights "the rights to one's own

In the Matter of Tapia.

religious opinion and to a public expression of them, or, as sometimes said, to worship God according to the dictates of one's own conscience; the right to personal liberty and individual property; to freedom of speech and of the press; to free access to courts of justice, to due process of law, and to an equal protection of the laws; to immunities from unreasonable searches and seizures, as well as cruel and unusual punishments; and to such other immunities as are indispensable to a free government. Of the latter class are the rights to citizenship, to suffrage, . . . and to the particular methods of procedure pointed out in the Constitution, which are peculiar to Anglo-Saxon jurisprudence, and some of which have already been held by the states to be unnecessary to the proper protection of individuals." See also Dorr v. United States, 195 U. S. 144, 49 L. ed. 130, 24 Sup. Ct. Rep. 808, 1 Ann. Cas. 697; Hawaii v. Mankichi, 190 U. S. 218, 47 L. ed. 1023, 23 Sup. Ct. Rep. 787, 12 Am. Crim. Rep. 465.

Theoretically the rights of man may be differentiated from the rights of an American, but wherever the American Constitution applies we are concerned only with the rights of Americans. Callan v. Wilson, 127 U. S. 549, 32 L. ed. 226, 8 Sup. Ct. Rep. 1301. The fact that states may abolish the grand jury does not give the United States that right.

### Territories South of the Ohio.

3. There were after the adoption of the Constitution cessions to the United States of territory south of the Ohio. Kentucky was admitted in 1792 as the first new state, it having been a district of Virginia and not having had any territorial government; and next came Ohio in 1802, the remaining Northwest

*In the Matter of Tapia.*

Territory being called Indiana territory, from which was cut off Illinois and Michigan territories. (2 Stat. at L. 58, 173, 201, 420, 514, chaps. 41, 40, 7, 16, 13, Comp. Stat. 1916, § 968, 3 Stat. at L. 289, 399, 536, chap. 57.) The proceedings creating these territories (and later admitting them as states) expressly recognized residents as entitled to vote. The legislation and proceedings as to Michigan will be found set out by Chief Justice Fuller in Boyd v. Nebraska, 143 U. S. 166, 36 L. ed. 111, 12 Sup. Ct. Rep. 375.

The present Tennessee was part of North Carolina and was ceded to the United States temporarily in 1784, permanently in 1789, and accepted by Congress by Act of April 2, 1790 (1 Stat. at L. 106, chap. 6), followed by the Act of May 26, 1790, creating a government for this "territory of the United States south of the Ohio river" (1 Stat. at L. 123, chap. 14). This follows, except as to slavery, the wording of the Ordinance for the Northwest Territory. The land between Tennessee and the line of 31 degrees, the supposed Louisiana-Florida boundary, was claimed by Georgia and South Carolina, and after negotiation was also ceded to the United States. This was organized into Mississippi Territory April 7, 1798, 1 Stat. at L. 549, chap. 28. Section 6 of this act provided that "the people of the aforesaid territory shall be entitled to and enjoy all and singular, the rights, privileges, and advantages granted to the people of the territory of the United States northwest of the river Ohio . . . in as full and ample a manner as the same are possessed and enjoyed by the people of the said last-mentioned territory." Out of this were subsequently created in 1817 the state of Mississippi and the territory of Alabama, and later in 1819 the state of Alabama.

In the Matter of Tapia.

These different cessions were within the original limits of the United States as defined by the treaty with Great Britain closing the Revolutionary War and acknowledging the independence of the United States. The inhabitants, with exceptions about Kaskaskia, Vincennes, Detroit, and elsewhere, were already American citizens and the country now owned by the United States had been previously owned by the several states; the incorporation therefore, both of people and country, into the Union, could not be doubted. Whether east or west of the Alleghanies all the national powers given Congress by the Constitution were put in force, and it was soon found that commercial interests, which had led to the formation of the Constitution, were to be the main element in developing the new nation as a whole. The postoffice and post roads, including the Cumberland road soon to be constructed north of the Ohio, the Federal courts with their special jurisdiction, naturalization, the rights of citizens of one state in all the other states, extradition, general taxation, including the growing subject of customs duties, shipping, foreign and domestic, uniform currency, the national system of land grants, including afterwards homesteads, patents, and copyrights, together with bankruptcy laws at certain periods, made up a program of peaceful national growth, and even the Indian wars on the western and southern frontiers and the war of 1812 with Great Britain tended in the same direction. The original thirteen states had public lands of their own, whose proceeds were used for public purposes, and the United States adopted a system of devoting public lands and proceeds in the new states largely to local purposes, such as schools. The territories, being at a distance from the seaboard, had special needs which were covered by Congress

before admitting them as new states.   This union of general
with local institutions is a peculiarity of Anglo-Saxon civiliza-
tion.   It showed itself even in judicial matters, and to this day
in the states, new or old, Federal law and procedure are in
many respects the same as those of the local courts.   Rev. Stat.
§§ 721, 914, Comp. Stats. 1916, §§ 1538, 1537.   Thus the
country east of the Mississippi was nationalized.

## Louisiana.

4. Terminus did not remain east of the Mississippi river,
however.   On April 30, 1803, Mr. Jefferson, strict construc-
tionist as he was, approved the treaty with Napoleon by which
Louisiana, that is to say, all the vast territory west of the Mis-
sissippi, was ceded to the United States.   The phraseology was
as follows (8 Stat. at L. 200):

"The First Consul of the French Republic desiring to give
to the United States a strong proof of his friendship, doth here-
by cede to the said United States, in the name of the French
Republic, forever and in full sovereignty, the said territory with
all its rights and appurtenances, as fully and in the same man-
ner as they have been acquired by the French Republic.   .   .   .
The inhabitants of the ceded territory shall be incorporated in
the Union of the United States, and admitted as soon as pos-
sible, according to the principles of the Federal Constitution,
to the enjoyment of all the rights, advantages, and immunities
of citizens of the United States; and in the meantime they shall
be maintained and protected in the free enjoyment of their lib-
erty, property, and the religion which they profess."

The treaty contained provisions for commissioners to deliver
and accept possession, Indian treaties, French and Spanish ves-

sels, and debts of citizens. It marked the beginning of foreign acquisition by the United States, and of the principle of incorporating the inhabitants of ceded territory into the Union. It recognized certain rights inherent in the inhabitants, despite their denationalization, and provided for the acquisition of others peculiar to citizens of the United States. That Mr. Jefferson supposed foreign territory could be acquired and inhabitants so admitted only by an amendment of the Constitution, of which he proposed two forms, is not material, inasmuch as, in point of fact, neither these nor any other constitutional amendment was finally thought necessary. Downes v. Bidwell, 182 U. S. 327, 45 L. ed. 1122, 21 Sup. Ct. Rep. 770. Mr. Jefferson did not consider the inhabitants to be ipso facto citizens of the United States. On taking possession in December Governor Claiborne's proclamation recited the words of the treaty and said nothing of citizenship to these 50,000 Creoles. A fifth of them were in New Orleans, and all indifferent to the transfer. 3 Gayarre, Louisiana, 622. Incorporation was secured by the Act of Congress of March 26, 1804 (2 Stat. at L. 283, chap. 38), creating the territory of Orleans, whose inhabitants "shall be entitled to and enjoy all the rights, privileges and advantages secured by the said ordinance for the Northwest Territory." The creation of the territory practically fulfilled the promise of the treaty. The only difference between the wording of this act and of the treaty with France is that the positive "privileges" is used, instead of the negative "immunities," and "citizens" is not used. The government was vested in a governor, and the legislative powers in the governor and thirteen discreet persons of the territory to be called the Legislative Council, to be appointed by the president. Its powers

### In the Matter of Tapia.

extended to modification of existing laws and to all rightful subjects of legislation "not inconsistent with the Constitution and laws of the United States." There were instituted local superior and inferior courts, and the inhabitants were entitled to habeas corpus and bail, and no cruel and unusual punishments shall be inflicted. Twenty-one general statutes of the United States were by title declared to "extend to and have full force and effect in the above-mentioned territories," 2 Stat. at L. 285, chap. 38, being the principal general laws which had been up to that time passed by Congress for national purposes. Section 8 of this act established a district court, with judge, attorney, and marshal, the first to exercise a separate jurisdiction from that of local courts in the territories. The same principle was followed afterwards in Hawaii and in Porto Rico, like Louisiana not English-speaking territories. The grand jury is contemplated in that all free male white persons were declared qualified to serve "as grand or petit jurors." This act was amended March 2, 1805, so as to allow a representative legislature (2 Stat. at L. 322, chap. 23), and, looking to statehood "conformably to the provisions of the treaty" of cession. Louisiana accordingly became a state in 1812, expressly adopting at that time the Constitution of the United States. 2 Stat. at L. 642, chap. 21. Citizenship as such could not be earlier conferred, since there was none except of the respective states. Scott v. Sandford, 19 How. 393, 15 L. ed. 691.

The "power of governing and legislating for a territory," says Chief Justice Marshall as to Orleans, "is the inevitable consequences of the right to acquire and hold territory. . . . Accordingly we find Congress possessing and exercising the absolute and undisputed power of governing and legislating for

the Territory of Orleans." Seré v. Pitot, 6 Cranch, 332, 336, 3 L. ed. 240, 241. The result was that the territory in question became fully incorporated into the polity of the United States. The northern or St. Louis part of the Louisiana Purchase was by the same act of 1804 made a separate territory, the district of Louisiana, but at first administered with Indiana territory. The district of Louisiana was made a separate territory under the name of Missouri on June 4, 1812. 2 Stat. at L. 743, chap. 95. The government was based on that for the Northwest Territory, with changes suggested by experience. The grand jury is mentioned, and there is the usual provision that voters must be "free white male citizens of the United States." §§ 6, 11. Missouri became a state under the famous compromise of 1820. 3 Stat. at L. 545, 645, chap. 22.

## Florida.

5. Closely connected with Louisiana, and indeed overlapping as to the Mobile district, which was occupied by the United States in 1813 under the Louisiana Purchase, was the Florida Purchase by treaty with Spain February 22, 1819. 8 Stat. at L. 255. By this his Catholic Majesty "cedes to the United States, in full property and sovereignty, all the territories which belong to him, situated to the eastward of the Mississippi, known by the name of East and West Florida," with islands, public lands, edifices, fortifications and other buildings not private property. By article 5 the inhabitants were secured in the free exercise of their religion, with the right to remove to the Spanish domains. Then follows in article 6 that "the inhabitants of the territories which his Catholic Majesty cedes to the United States, by this treaty, shall be incorporated in the

## In the Matter of Tapia.

Union of the United States, as soon as may be consistent with the principles of the Federal Constitution, and admitted to the enjoyment of all the privileges, rights, and immunities, of the citizens of the United States," as in the Louisiana Treaty. The other provisions of the treaty are not at present material. Chief Justice Marshall in American Ins. Co. v. 356 Bales of Cotton, 1 Pet. 511, 7 L. ed. 242, comments on the 6th article as follows: "This treaty is the law of the land, and admits the inhabitants of Florida to the enjoyment of the privileges, rights, and immunities of the citizens of the United States. It is unnecessary to inquire whether this is not their condition, independent of stipulation. They do not, however, participate in political power; they do not share in the government, till Florida shall become a state. In the meantime, Florida continues to be a territory of the United States."

By Acts of March 3, 1819 (3 Stat. at L. 523, chap. 93) and March 3, 1821 (3 Stat. at L. 637, chap. 39) provision was made for a temporary government of these territories under the direction of the President of the United States. An act concerning the commerce and navigation of Florida shows that at this time the inhabitants of the ceded territory were not regarded as citizens of the United States, for "the inhabitants who were residents July 10, 1821, or citizens of the United States resident therein," were entitled to the privilege of owning American vessels. 3 Stat. at L. 660, chap. 15. The real organization of the territory of Florida was by the Act of March 3, 1823 (3 Stat. at L. 750, chap. 28), which is practically modeled upon that for the territory of Orleans. The provisions as to governor, legislative council, courts, laws extended and otherwise, are almost identical, except that there was no separate Federal dis-

In the Matter of Tapia.

trict court, and, after a long list of laws extended to the territory, comes for the first time a general clause extending all other public laws not repugnant to the territorial act. There is the old provision as to grand and petit juries, and the "citizens of the territory" are given the right to send a delegate to Congress like other territories.

The Canter statement as to citizenship by treaty must be taken in the generic sense that the inhabitants had ceased to be foreigners as Porto Ricans are not foreigners (Gonzales v. Williams, 192 U. S. 1, 48 L. ed. 317, 24 Sup. Ct. Rep. 177), and indeed are Americans to the extent of the American right of suing in forma pauperis. (Pares v. Cordova, 6 Porto Rico Fed. Rep. 173. Also Gonzales y Gonzales v. Arzuaga é Izaguirre, 6 Porto Rico Fed. Rep. 222.)

There was as yet no American citizenship except through that of a state, although collectively the people were called Americans—as Pitt had called them during the Revolution.

## Texas.

6. The next great addition to the Union grew out of the relations with Texas and Mexico. Texas had a revolutionary government and was annexed by a joint resolution in March, 1845, accepted by Texas, and December 29 it was admitted into the Union as a new state, on an equality with all the other states, and necessarily therefore with full citizenship, although Texas retained its vast public lands. This action led to war with Mexico, which was concluded by the Treaty of Guadalupe Hidalgo of February 2, 1848, ratified a few months later, adding California and a new Southwest, increased somewhat by the Gadsden Purchase of December 30, 1853. The treaties with

Mexico adopted the device, suggested but not carried out in Jefferson's time as to Louisiana, of fixing a new boundary for the United States, which with the congressional appropriation of money to pay for the new territory necessarily incorporated it into the Union. The discovery of gold in California led to such development that in 1849 a Constitution was adopted, and on September 9, 1850, California was admitted as a state without any real existence previously under a territorial system. Citizenship resulted from statehood.

## *Citizenship.*

7. The incorporation of territory is only for the benefit of the inhabitants, present or future, but there was no declaration in the act creating the territories that they were made American citizens. The word "citizen" we have seen employed once in the Declaration of Independence, oftener in the Articles of Confederation, and still more frequently in the Constitution, but even in the latter "persons" and "inhabitants" are more common. "People of the United States" and "citizens" are synonymous. Boyd v. Thayer, 143 U. S. 135, 159, 36 L. ed. 103, 108, 12 Sup. Ct. Rep. 375. The American use of the word "citizen" dates from the American Revolution (Minor v. Happersett, 21 Wall. 166, 22 L. ed. 627), but its present employment is due largely to the influence of the French Revolution, which adopted the word "citoyen" not only as a political term, but one of common address. A citizen is one of the sovereign people, a constituent member of the sovereignty, which in the United States is synonymous with the people. Scott v. Sandford, 19 How. 393, 404, 15 L. ed. 691, 700, United States v. Cruikshank, 92 U. S. 542, 549, 23 L. ed. 588, 590; Boyd v. Nebraska, 143 U. S. 135, 159,

In the Matter of Tapia.

36 L. ed. 103, 108, 12 Sup. Ct. Rep. 375. It is the greatest of all "rights, privileges, and immunities;" indeed it is their joint product.

For over sixty years after the Purchase of Louisiana there was no citizen of the United States who was not first a citizen of some state. "Every citizen of a state," says Judge Story, "is ipso facto a citizen of the United States." Commentary on the Constitution, § 1693. "Every free person born on the soil of a state, who is a citizen of that state by force of its Constitution or laws, is also a citizen of the United States," says Mr. Justice Curtis, Scott v. Sandford, 19 How. 393, 575, 15 L. ed. 691, 771.

Under the Constitution there are "two sources of citizenship and two sources only,—birth and naturalization. . . . And the words relate to the time of birth in the one case, as they do to the time of naturalization in the other. Persons not thus subject to the jurisdiction of the United States at the time of birth cannot become so afterwards, except by being naturalized, either individually, as by the proceedings under the naturalization acts, or collectively, as by the force of a treaty by which foreign territory is acquired." Elk v. Wilkins, 112 U. S. 94, 102, 28 L. ed. 643, 646, 5 Sup. Ct. Rep. 41. A treaty changes the political although not the municipal relations of a people. United States v. Percheman, 7 Pet. 51, 8 L. ed. 604. Individual naturalization has been the policy of the United States from the year 1802, and the system is found in Revised Statutes, § 2165, and in the legislation of 1906 and later. Expatriation has been declared by Federal legislation to be a natural and inherent right of all people. 15 Stat. at L. 223, chap. 249, Rev. Stat. § 1999, Comp. Stat. 1916, § 3955. This government has freely received emi-

In the Matter of Tapia.

grants from all nations and invested them with rights of citizenship.[1]

8. The country west of the Mississippi was from time to time divided into territories with definite boundaries under special acts of Congress,[2] generally in their titles declared to be "to provide a temporary government." Indeed a territorial system

---

[1] The dealing of the United States with the Indians shows many instances of collective naturalization. The aborigines lived in their old tribal relations, qualified nations (Cherokee Nation v. Georgia, 5 Pet. 1, 8 L. ed. 25) and were not affected by territorial legislation. They were not deemed citizens except by special treaty making them such collectively or authorizing individuals to be naturalized upon application to Federal courts.

Instances are found in treaties in 1817 and 1835 with the Cherokees, and in 1820, 1825, and 1830 with the Choctaws, 7 Stat. at L. 159, 211, 236, 335, 483, 488; Wilson v. Wall, 6 Wall. 83, 18 L. ed. 727; Cherokee Trust Funds, 117 U. S. 288, 29 L. ed. 880, 6 Sup. Ct. Rep. 718; Opinion of Attorney General Taney, 2 Ops. Atty. Gen. 462; with the Stockbridge Indians in 1848 and 1856, 9 Stat. at L. 955, 11 Stat. at L. 663; in 1861 and in March 1866, with the Pottawatomies, 12 Stat. at L. 1192; 14 Stat. at L. 763; in 1862 with the Ottawas, 12 Stat. at L. 1237; and the Kickapoos, 13 Stat. at L. 624; and Acts of Congress of March 3, 1839, chap. 83, § 7, concerning the Brothertown Indians, and of March 3, 1843, chap. 101, § 7, Aug. 6, 1846, chap. 85, and March 3, 1865, chap. 127, § 4, concerning the Stockbridge Indians, 5 Stat. at L. 351, 647; 9 Stat. at L. 55; 13 Stat. at L. 562, Rev. Stat. § 2312, Comp. Stat. 1916, § 3950; with the Winnebagoes in Minn. July 15, 1870, 16 Stat. at L. 361, chap. 296; the Miamis in Kansas, March 3, 1873, 17 Stat. at L. 632, chap. 332.

[2] A total list of the territories, including those also formed from the Northwest Territory, is as follows: Northwest Territory 1787, Ordinance of 1787; Territory south of the River Ohio 1790, 1 Stat. at L. 123, chap. 14; Mississippi 1798, 1 Stat. at L. 549, chap. 28; Indiana 1800, 2 Stat. at L. 58, chap. 41; Oleans 1804, 2 Stat. at L. 283, chap. 38; Louisiana 1805, 2 Stat. at L. 331, chap. 31; Michigan 1805, 2 Stat. at L. 309, chap. 5; Illinois 1809, 2 Stat. at L. 514, chap. 13; Missouri 1812, 2 Stat. at L. 743, chap. 95; Alabama 1817, 3 Stat. at L. 371, chap. 59; Arkansas 1819, 3 Stat. at L. 493, chap. 49; Florida 1822, 3 Stat. at L. 654, chap. 13; Wisconsin 1836, 5 Stat. at L. 10, chap. 54; Iowa 1838, 5 Stat. at L. 235, chap. 96; Oregon 1848, 9 Stat. at L. 323, chap. 177; Minnesota 1849, 9 Stat. at L. 403, chap. 121; New Mexico 1850, 9 Stat. at L. 446, chap. 49; Utah, 1850,

finally grew up which has found its place in the Revised Statutes, §§ 1839–1895, Comp. Stat. 1916, §§ 3425–3430, 3432–3439, 3442–3444, 3446–3449, 3452–3457, 3459–3468, 3470, 3471, 3473–3475, 3477, 3478, 3489, 3522, 3524–3527. This provided for a uniform organization of the territories, and in § 1891, that "the Constitution and all the laws of the United States which are not locally inapplicable shall have the same force and effect within all the organized territories, and every territory hereafter organized as elsewhere in the United States." All the contiguous territories were gradually admitted as states. Territories were permanent incorporations into the Union, and constitutional principles applicable to them did not apply to such temporary acquisitions as the Guano Islands, defined by Act of 1856 (Rev. Stat. § 5570, Comp. Stat. 1916, § 3916). Jones v. United States, 137 U. S. 202, 34 L. ed. 691, 11 Sup. Ct. Rep. 80. The absolute control by Congress always remained. Church of Jesus Christ of L. D. S. v. United States, 136 U. S. 1, 34 L. ed. 478, 10 Sup. Ct. Rep. 792. The general plan was to leave local matters to local regulations (Clinton v. Englebrecht, 13 Wall. 441, 20 L. ed. 660), and for some purposes territories are much like counties of a state. First Nat. Bank v. Yankton County, 101 U. S. 133, 25 L. ed. 1047.

9 Stat. at L. 453, chap. 51; Washington 1853, 10 Stat. at L. 172, chap. 90; Nebraska 1854, 10 Stat. at L. 277, chap. 59; Kansas 1854, 10 Stat. at L. 277, chap. 59; Colorado 1861, 12 Stat. at L. 172, chap. 59; Nevada 1861, 12 Stat. at L. 209, chap. 83; Dakota 1861, 12 Stat. at L. 239, chap. 86; Arizona 1863, 12 Stat. at L. 664, chap. 56; Idaho 1863, 12 Stat. at L. 808, chap. 117; Montana 1864, 13 Stat. at L. 85, chap. 95; Wyoming 1868, 15 Stat. at L. 178, chap. 235; District of Columbia 1871, 16 Stat. at L. 419, chap. 62; Alaska 1884, 23 Stat. at L. 24, chap. 53; Oklahoma 1890, 26 Stat. at L. 81, chap. 182; Indian Territory 1889, 25 Stat. at L. 783, chap. 333, and 1890, 26 Stat. at L. 81, chap. 182.

### In the Matter of Tapia.

The law creating the territory of Oklahoma, formerly Indian Territory, is the last of the original contiguous territories and is the most lengthy of all. It extends the laws of the United States and of Nebraska over the territory (26 Stat. at L. 81, 87, chap. 182), which is spoken of as a "portion of the United States" (p. 81) and "the Constitution and all laws of the United States not locally inapplicable shall . . . have the same force and effect as elsewhere within the United States" (p. 93). In the remaining part of Indian Territory provision is made for extending certain laws of Arkansas, and "the Constitution . . . and all general laws of the United States which prohibit crimes and misdemeanors in any place within the sole and exclusive jurisdiction of the United States except in the District of Columbia . . . shall have the same force and effect in the Indian Territory as elsewhere in the United States" (p. 96), and provision was made for naturalization in the United States court of "any resident member of any Indian tribe or nation" (p. 99). The two territories were admitted as the state of Oklahoma in 1907 (34 Stat. at L. 267, chap. 3335), to which lands were granted outright, instead of under the Swamp and Overflowed Land Law of 1850 and internal improvement legislation of 1841 for the older states (p. 274). Voters for the constitutional convention were residents "who are citizens of the United States or who are members of any Indian nation or tribe" (p. 268). With the success of the plan of individual, instead of tribal, ownership of lands, the Indians have become American citizens, with few remaining exceptions.

### Alaska.

9. After the Civil War, the 14th Amendment had changed

the matter of citizenship; for it provided that there was a citizenship of the United States distinct from that of the states. Slaughter-House Cases, 16 Wall. 36, 126, 21 L. ed. 394, 424. This has resulted in a making over of Federal policy. The Amendment declares:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The first acquisition under these new conditions was the convention with Russia March 30, 1867, for Alaska, the first noncontiguous territory. This ceded public lands and other property, the transfer being actually made October 18, 1867. Art. 3 provided: "The inhabitants of the ceded property . . . if they should prefer to remain in the ceded territory . . . shall be admitted to the enjoyment of all the rights, advantages and immunities of the citizens of the United States and shall be maintained and protected in the free enjoyment of their liberty, property and religion." This relates to inhabitants of noncontiguous land, but is stronger than that employed in any of the previous treaties for contiguous acquisitions. Downes v. Bidwell, 182 U. S. 335, 345, 45 L. ed. 1125, 1128, 21 Sup. Ct. Rep. 770. On July 20, 1868, Congress extended internal revenue taxation to Alaska. 15 Stat. at L. 125, 167, chap. 186. On July 27, 1868, it extended the national laws as to commerce and navigation to Alaska. 15 Stat. at L. 240, chap. 273. Under authority conferred by the Judiciary Act of March 3, 1891, § 6,

IX. Porto Rico.—31.

In the Matter of Tapia.

the Supreme Court on May 11 of that year assigned Alaska to the ninth judicial circuit. 26 Stat. at L. 826, chap. 517. The result was that Alaska was one of the territories of the United States and its people citizens. The Coquitlam v. United States, 163 U. S. 346, 352, 41 L. ed. 184, 186, 16 Sup. Ct. Rep. 1117. The Interstate Commerce Act also applied to Alaska as well as to other territories. As Alaska had been incorporated into the Union, liquor licenses, if levied by Congress under the general grant in the Constitution for raising national revenue, must necessarily be uniform with licenses elsewhere in the United States. Congress, however, is to be considered as a local legislature for territories, and a difference in licenses where the proceeds were used for local purposes only was not unconstitutional. Binns v. United States, 194 U. S. 486, 48 L. ed. 1087, 24 Sup. Ct. Rep. 816. Local conditions may make it proper to have a different tax regulation in a territory, and this will not be repugnant to the uniformity clause of the Constitution. While Congress may, under such circumstances, waive its right to collect uniform taxes from a territory, it may be a very different proposition to say that Congress can establish different personal rights for citizens in a territory. Alaska is an organized territory in the legal sense of the word, although without a legislature (Binns v. United States, 194 U. S. 491, 48 L. ed. 1088, 24 Sup. Ct. Rep. 816), and the right of an American there to a jury of twelve, one of the Anglo-Saxon judicial landmarks, cannot be taken away by Congress. Rassmussen v. United States, 197 U. S. 516, 49 L. ed. 862, 25 Sup. Ct. Rep. 514.

In the Matter of Tapia.

## Hawaii.

10. On July 7, 1898, a joint resolution, commonly called the Newlands Resolution, was passed by Congress "to provide for annexing the Hawaiian Islands to the United States." It recited that the Republic of Hawaii had signified its assent to cede absolutely all rights of sovereignty as well as the fee of all public lands. The cession was "accepted, ratified, and confirmed, and that the said Hawaiian Isands and their dependencies be, and they are hereby, annexed as a part of the territory of the United States and are subject to the sovereign dominion thereof." 30 Stat. at L. 750. Municipal legislation was to continue, but no provision was made as to citizenship. During the continuance of a provisional government under this resolution, still called the Republic of Hawaii, arose the case of Hawaii v. Mankichi, 190 U. S. 197, 47 L. ed. 1016, 23 Sup. Ct. Rep. 787, 12 Am. Crim. Rep. 465, wherein a person who was tried for an infamous crime without indictment by a grand jury sought release under the constitutional provision on the subject of juries. It was held that the Constitution did not at once apply so far as related to matters requiring legislation, for a reasonable time should be allowed to the local authorities to adapt themselves to the new legal circumstances, there being no legislature then in existence. Id. p. 216. After that there was passed on April 30, 1900, "An Act to Provide a Government for the Territory of Hawaii," § 3 expressly naming Hawaii as a territory, and § 4 declaring that "all persons who were citizens of the Republic of Hawaii on August 12, 1898, are hereby declared to be citizens of the United States and citizens of the territory of Hawaii." 31 Stat. at L. 141, chap. 339, Comp. Stat. 1916, § 3647. This law as to Ha-

In the Matter of Tapia.

waii was passed eight days after what is called the Foraker Act was adopted as to Porto Rico, and the two are analogous in many respects except as to citizenship, which was granted Hawaii in less than two years. The Hawaiian Act incorporated that territory into the Union. Mankichi Case, 190 U. S. 211, 220, 47 L. ed. 1020, 1023, 23 Sup. Ct. Rep. 787, 12 Am. Crim. Rep. 465.

## *Philippines.*

11. The next addition to the United States was under the Treaty of Paris of December 10, 1898, ratified at Washington April 11, 1899, concluding the Spanish-American War and making as great a change in foreign affairs as the 14th Amendment did in domestic. This originated in regard to Cuba (art. 1), and Spain by the treaty "relinquishes all claims of sovereignty over and title to Cuba," with the result that the United States was to occupy Cuba temporarily. On the other hand, by article 2, "Spain cedes to the United States the island of Porto Rico and other islands now under Spanish sovereignty in the West Indies, and the island of Guam in the Marianas Ladrones," and in article 3, cedes to the United States "the archipelago known as the Philippine Islands," the United States paying the amount of $20,000,000. Other provisions of the treaty provided for evacuation of Porto Rico and the other territories described, for Spanish subjects, religion, and the like, some temporary and some permanent. It is provided in article 9, that "the civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress." [30 Stat. at L. 1755.][1] This treaty therefore

---

[1] These words, sanctioned by general treaty use, are used in the acquisition August 4, 1916, of the Danish West Indies.

In the Matter of Tapia.

for the first time brought under the American flag dominions which were not in any sense part of the United States, but only possessions, territory but not a territory in the old sense, whose inhabitants were not Americans, and to whom the treaty of acquisition did not promise citizenship.

The Philippines were governed by a commission acting under the authority given the President by the so-called Spooner resolution of March 2, 1901. One of the laws of this commission related to libel and under it an editor was prosecuted. Upon his trial he demanded a jury under the Constitution, and this was denied. In Dorr v. United States, 195 U. S. 138, 49 L. ed. 128, 24 Sup. Ct. Rep. 808, 1 Ann. Cas. 697, the Supreme Court held that Congress had not incorporated the Philippines into the Union, that the Constitution therefore did not extend to the Islands proprio vigore, and consequently that Amendment 5, on the subject of jury, was not applicable. The concurring opinion of Justice White in the Insular Cases is in effect adopted as the opinion of the court in the Dorr Case, supra.

Since then an organic act of July 1, 1902, has been passed for the Philippines, containing a Bill of Rights. 5 Fed. Stat. Anno. 718. This Bill contains almost all the provisions of the Constitution of the United States as to personal rights, with the exception of Amendment 5 as to grand jury and petit jury. It was accordingly held in Kepner v. United States, 195 U. S. 100, 49 L. ed. 114, 24 Sup. Ct. Rep. 797, 1 Ann. Cas. 655, that the Bill of Rights was the form in which "it was intended to carry to the Philippine Islands those principles of our government which the President declared to be established as rules of law for the maintenance of individual freedom." The jury system, being un-

In the Matter of Tapia.

familiar to the Filipinos, was not so extended, and the right to withhold it from a territory not incorporated was sustained.

So far as the Philippine Islands are concerned, therefore, the promise made by the United States in the Treaty of Paris to determine the political status of the Filipinos has up to this time been decided by Congress against incorporating them or the islands into the United States.

## *Porto Rico.*

12. What has Congress done in regard to Porto Rico? As to land the United States has taken and retains possession of public property, such as buildings, forts, and the like, and erected a very substantial Federal building, in which are offices for most of the civil officials, including this court. It has dredged and otherwise improved the harbor of San Juan, and has established harbor lines, lighthouses, and public facilities connected with navigation, including cables and wireless communication.

Anything done for the material welfare of the people, however, is inconclusive as to incorporation into the Union. The United States did almost the same thing for Cuba during the occupancy, which was not intended in any respect to be permanent or to work incorporation of Cuba with the Union. The United States did somewhat the same thing for Vera Cruz while recently occupied by Federal military forces, and indeed might do almost all of these different things anywhere in the world as a matter of help to a friendly people. While important, these items are dependent upon spiritual elements for their significance.

In regard to the element of people or inhabitants also Congress has been very, very liberal. Under the Foraker Act there

In the Matter of Tapia.

was a general assimilation of Porto Rico to the system of terri-
tories provided for in Revised Statutes, §§ 1841–1895, Comp.
Stat. 1916, §§ 3427–3430, 3432–3439, 3442–3444, 3446–3449,
3452–3457, 3459–3468, 3470, 3471, 3473–3475, 3477, 3478,
3489, 3522, 3524–3527, although it was done by a separate act
and the provision as to extending the Constitution contained in
§ 1891 was omitted. A government was established on the
American model, consisting of executive, legislative and ju-
dicial departments, except that no reference was made to grand
juries and none to juries in civil cases. A system of schools
and education had been established under the temporary mili-
tary government from 1898 to 1900, and under the Foraker
Act, § 25, this has been broadened, many handsome schoolhouses
erected, and the system put on a good basis, contemplating edu-
cation in English, as well as in Spanish.

The essential element of incorporation relates not to the local
side as do the elements of land and people, but to the national
side, to the intent of Congress in what it has done.

The Foraker Act provided that the governor and upper offi-
cials should be appointed by the President, that the island should
be represented in Congress by a delegate who is, however, called
a commissioner, that Congress may disapprove all acts of the
Legislature, and § 14 provides: "That the statutory laws of the
United States not locally inapplicable, except as hereinbefore
or hereinafter otherwise provided, shall have the same force and
effect in Porto Rico as in the United States, except the internal
revenue laws, which, in view of the provisions of § 3, shall not
have force and effect in Porto Rico." [31 Stat. at L. 80, chap.
191, Comp. Stat. 1916, § 3762.]

The United States have established postoffices, with the same

In the Matter of Tapia.

rates and administration as elsewhere in the states. By § 9 of the Foraker Act the commissioner of navigation was required to make regulations for the nationalization of all vessels owned by the inhabitants of Porto Rico, and admit them to the coasting trade. This was interpreted by the Supreme Court as placing "Porto Rico upon the coast of the United States," substantially as was done by Revised Statutes, §§ 4358, 4348, Comp. Stat. 1916, §§ 8111, 8100, as to trade between Alaska and the rest of the United States. Hunus v. New York & P. R. S. S. Co. 182 U. S. 392, 45 L. ed. 1146, 21 Sup. Ct. Rep. 827. This provision was similar to that adopted for Hawaii in 1888. 31 Stat. at L. 141, chap. 339, § 98, Comp. Stat. 1916, § 3734. Perhaps more significant is what the United States has done in regard to national courts. Even under the military there was a provisional Federal court, and this was expressly continued in the Foraker Act, § 34, and made permanent under the present Jones Act, § 41, with more extensive powers. Nevertheless after all these different acts of Congress and of the government the Supreme Court, before the Jones Act, declared Porto Rico a territory of the United States not incorporated into the Union. New York ex rel. Kopel v. Bingham, 211 U. S. 468, 476, 53 L. ed. 286, 289, 29 Sup. Ct. Rep. 190; American R. Co. v. Didricksen, 227 U. S. 145, 148, 57 L. ed. 456, 457, 33 Sup. Ct. Rep. 224; Gromer v. Standard Dredging Co. 224 U. S. 362, 56 L. ed. 801, 32 Sup. Ct. Rep. 499; Porto Rico v. Rosaly y Castillo, 227 U. S. 270, 274, 57 L. ed. 507, 508, 33 Sup. Ct. Rep. 352. In other words, the Foraker Act, which on its face is declared to be "an act temporarily to provide revenues and a civil government for Porto Rico and for other purposes," did not effect incorporation, which constitutes a permanent status.

In the Matter of Tapia.

*Jones Act.*

13. Has any change in the situation been wrought since the Foraker Act? One of the indicia of incorporation named by the Supreme Court in the Rassmussen Case, 197 U. S. 516, 49 L. ed. 862, 25 Sup. Ct. Rep. 514, applies even more strongly in Porto Rico. Alaska was placed in the ninth circuit by the Supreme Court under its general powers; Porto Rico was made a part of the first circuit by direct act of Congress amending § 116 of the Judicial Code in such a way that no distinction is drawn between Porto Rico and any states in that circuit. Act of January 27, 1915. Porto Rico, therefore, is in all respects essentially and permanently a part of the Federal judicial system.

On the other hand, the Foraker Act exempted Porto Rico from the internal revenue system of the United States, while the Jones Act has gone further; and, while applying all applicable statutory laws to Porto Rico, withholds the title "territory" and expressly exempts from application here the Safety Appliance Act and the Interstate Commerce Act, previously declared in force in Porto Rico, and permits the Porto Rican authorities to legislate on the subject of internal revenue, while the United States retains the national income tax, and applies the new Shipping Act of September 7, 1916. Under both acts the revenues from customs were and are collected by United States officials, but turned over to the Insular treasury, and Insular expenses and salaries are paid therefrom, and not as in other territories from Federal appropriations.

The Porto Rican government as organized by Congress could not be carried on from the revenues which would be raised by taxation usual in the old territories. On account of the moun-

In the Matter of Tapia.

tainous nature of the island, privately owned railroads are almost impracticable, and expensive public high roads and viaducts are essential to internal traffic, and in the same way, there never having been any public schools under the Spaniards, the school system for a million and a quarter people must be expensive, especially at the beginning. Conditions being special, a special treatment is required. Congress had effected special treatment of the school question in all states outside of the original thirteen by donations of the sixteenth sections and other public lands from a very early date. This has never been considered a violation of the uniformity clause or the general theory contemplated by the union of equal states. If the money from Porto Rican customs was collected and covered into the Treasury of the United States, no reason appears why the same amount could not be appropriated by Congress to meet the special needs of Porto Rico where it was collected, and paying it directly into the local treasury would seem to be a simpler and unquestionably a constitutional means of effecting this end. Binns v. United States, 194 U. S. 486, 48 L. ed. 1087, 24 Sup. Ct. Rep. 816. The same is true of the provision that interstate commerce legislation shall not apply to a community which, from its location, cannot have any interstate or interterritorial commerce of the kind usually controlled by the Interstate Commerce Commission, while the new Shipping and other Acts do apply. That the uniform system of the old contiguous territories found in the Revised Statutes is not preserved in Insular territories shows the adaptability of the Federal system, and what can be effected by Congress in meeting new conditions. The separate Federal court in Hawaii and Porto Rico, for instance, is substantially what was enacted for Orleans Territory before it became Eng-

lish-speaking and while it was Latin in sentiment, and is a wise provision. Congress is not hampered in territorial arrangements except by constitutional prohibitions. Dorr v. United States, 195 U. S. 143, 49 L. ed. 130, 24 Sup. Ct. Rep. 808, 1 Ann. Cas. 697. It may, if it thinks distance, race, language, and circumstances require, confer more or less self-government than when a colony of Anglo-Saxons live across an imaginary line from other Anglo-Saxons. The object of the territorial form is to Americanize with the least friction, retaining all appropriate local institutions, and to do this wisdom will suggest one thing in the Arctic, another in the Pacific, and yet another in the West Indies. Thus, there were local adjustments as to schools and otherwise in the original contiguous territories settled by Americans. The same was true as to court and different details of French Louisiana, and then with yet other details true of foreign Hawaii and Alaska, whose native populations have yielded to American influences and immigration. It is as true in Porto Rico, where those influences meet another civilization, old and developed, with a great barrier to mutual understanding in the language, and where population is so dense that immigration can be only slight and American influences must be more gradual. Variations of plan are needed, but Federal government with its flexible territorial system is not shortened but rather quickened by difficulties. American institutions will have full play, and will act perhaps more gradually, but not less surely than before. Special treatment, therefore, does not indicate that Congress does not incorporate Porto Rico into the Union. It comes within the principle of the Binns license case, and is only a proper instance of Congress as the supreme legislature legislating for the interests of a territory. First Nat. Bank v.

In the Matter of Tapia.

Yankton County, 101 U. S. 129, 133, 25 L. ed. 1046, 1047. So much negatively.

### Citizenship in Porto Rico.

14. But the matter receives positive light from another direction. Congress by § 5 of the Jones Act of March 2, 1917, said that "all citizens of Porto Rico  .  .  .  are hereby declared and shall be deemed and held to be citizens of the United States" [39 Stat. at L. —, chap. 145], with certain option of disclaimer within six months, which it is conceded is embraced by only a negligible number of Porto Ricans. These must be held to be somewhat in the condition of people in Rhode Island after the other states had ratified the Constitution and left her the sole member of the old Confederation.

The Jones Act naturalizes Porto Ricans collectively and carries out the pledge of the Treaty of Paris, for it fixes the political status of the Porto Ricans by declaring in § 5 that they are citizens of the United States. They have all the rights, privileges, and immunities of such, and must therefore have them at home in Porto Rico.

What is the effect of this grant? The original Foraker Act contained it, but it was struck out before the bill was passed. The report of the commission to revise and compile the laws of Porto Rico, provided for in § 40 of the Foraker Act, contained in H. R. Document No. 52 of the 57th Congress, declared for a territorial government in so many words, with a joint American and Porto Rican citizenship (p. 326). This report was in April, 1901, therefore before the Insular decision of May 27, 1901, and before the other decisions which have been above discussed, but there was no American citizenship granted until the Jones Act

In the Matter of Tapia.

of 1917. The legislation based on the Treaty of Paris introduced the word "possession" into law as denoting unincorporated territory with its people, and it will be well to have some specific word therefor. It is not necessary to use the word "territory," however, even where people are made part of the American polity, if the different acts of Congress show that one has been created. Facts speak louder than words.

The above review of precedents shows that incorporation of territory, like the Northwest Territory and that south of the river Ohio, presupposed citizenship in some of the people, and a quasi citizenship in all, for it was a promise of ultimate statehood. The Louisiana Purchase and the Florida Treaty promised the same thing, and the territory was incorporated into the Union by the acts creating the original and later territories, if it was not by the treaty, while a quasi citizenship was granted in the same manner in fulfilment of that promise. Since the 14th Amendment there can be citizenship without statehood, and thus upon acquiring Alaska and the annexation of Hawaii the acts incorporating these territories granted citizenship. Since the Spanish-American War the policy of the United States as to noncontiguous lands has broadened and some foreign have become domestic problems, but it still rests upon the question of incorporation into the American commonwealth of land and people. Heretofore a territory has been a state in the making. "What constitutes a state? . . . Men who their duties know, but know their rights and knowing dare maintain," says that great jurist, Sir Williams Jones. Citizens constitute a state. Incorporation means citizenizing or it means little or nothing.

The Treaty of Paris departed from the old policy and con-

### In the Matter of Tapia.

tained no promise of incorporation, but left the matter open for congressional action.  Congress has not incorporated the Philippine Islands into the Union or made its people citizens.  On the other hand, in everything except a few local regulations, which are consistent with incorporation and are a proper exercise of Congress's right over territories, Congress has made Porto Rico a part of the geographical, commercial, and judicial system of the nation, and has by the last organic act conferred citizenship also.  Here, therefore, American policy is unchanged except that citizenship since the 14th Amendment is hastened; as previously, incorporation and citizenship imply each other, for they are practically synonymous, and of the two citizenship is the greater because it is the end to which the other is the means.

This being true, the Constitution applies to those newly made Americans in Porto Rico just as much as to the older Americans on the continent.  There cannot be two kinds of Americans under a Republic, as there were two or more kinds of Spaniards under a monarchy.  Americans abroad occupy a temporary relation to local institutions, and, where there are consular courts, may enjoy only a part of their American birthright.  Re Ross, 149 U. S. 453, 35 L. ed. 581, 11 Sup. Ct. Rep. 897.  And the same is true of Americans in possessions like the Philippines. Dorr v. United States, 195 U. S. 138, 49 L. ed. 128, 24 Sup. Ct. Rep. 808, 1 Ann. Cas. 697.  But it cannot be true that American citizens under the Jones Act can only enjoy full American rights by leaving their home in Porto Rico and going over to the states.  Do not even aliens the same?  They would then have only the rights of foreigners, for foreigners coming into the United States enjoy the rights of juries and grand juries.  Those

In the Matter of Tapia.

formerly called Porto Ricans are now fully Americans in every sense of the word, and can claim all political and personal rights which Americans can claim in territories incorporated into the Union; that is to say, in districts made part of the United States. If incorporation may be a gradual process, Federal legislation furnishes many indicia that it has passed the line which keeps Porto Rico isolated from national life. If it be necessary that it be effected by one act of Congress, it was conferred by the Jones Act when, above all things, it made the local Porto Ricans American citizens. The fact that Congress failed to enumerate a grand jury and the like in the Bill of Rights is immaterial. Congress positively provided a majority jury for Alaska, but the provision was void because Congress had no constitutional right to break up the common-law jury rule. So as to Porto Rico, the Constitution fills out the enumeration where Congress has left an omission. Incorporation once made is complete and permanent, and Congress cannot revoke or limit it even if it so desired. And such desire cannot be presumed. Enumeration of rights was unnecessary, and the Constitution supplies every lack and omission. Porto Rico is not only incorporated into the Union in every sense of the word, but is an instance of the creation of special features made proper by new conditions. The territorial system is not limited to the old one found in the Revised Statutes. Under the Constitution there is room in the Federal system for all kinds of territories. The Federal system requires the reservation only of national rights; all local privileges consistent therewith can be granted to what are called territories. In the Federal system there is room for everything except independent states. It follows, therefore, that the 5th Amendment of the Constitution applies to Porto Rico.

In the Matter of Tapia.

## *Habeas Corpus.*

15. Was, however, this habeas corpus prematurely brought? In the Mankichi Case, 190 U. S. 218, 47 L. ed. 1023, 23 Sup. Ct. Rep. 787, 12 Am. Crim. Rep. 465, the Supreme Court held that the rule of reason, so to speak, was to be applied in constitutional matters. Porto Rico during its three hundred years under the Spaniards had nothing equivalent to a grand jury, and since the American occupation, despite many other changes, this particular one has not been introduced by statute except in the Federal court. Crowley v. United States, 194 U. S. 461, 48 L. ed. 1075, 24 Sup. Ct. Rep. 731. The passage of the Jones Act March 2, 1917, now brings with it this new institution, but finds no machinery existing under which a grand jury can be organized. Unlike Hawaii, the legislature was in session for about a month between the passage of the act and the bringing of this suit, and then its session expired by limitation, but no reason existed against a special session. There was no ignorance of the passage of the act, or indeed of its principal features, no necessity as there was for retaining old rates of duties as in Cross v. Harrison, 16 How. 164, 14 L. ed. 889. A grand jury law apparently could have been passed, but the Legislature exercised its discretion to devote its time to what it deemed pressing political matters. Does this deprive American citizens of their historical safeguard? Can the court balance the matter of personal civil right against possible public convenience? Right must come before convenience, unless they can be harmonized. The petitioner, Carlos Tapia, is out on bail, and no reason is perceived why this condition could not continue the three months intervening before the new legislature convenes, when the court has reason to believe it will pass a grand jury law. Petitioner

In the Matter of Tapia.

has the right to a grand jury, not the right to escape indictment by a grand jury.

The order of the court, therefore, will be that under his petition Tapia will be adjudged entitled to the writ, but, as done in Ex parte United States, 242 U. S. 27, 61 L. ed. 129, 37 Sup. Ct. Rep. 72, Ann. Cas. 1917B, 355, the execution of this order will be postponed until the 25th day of August, 1917, the same being a day of the present term. This will not interfere with his constitutional right to a speedy trial, for that refers primarily at least to trial before a petit jury. If by that date an indictment has not been found against him by a grand jury, he will be released; if there has been such indictment found by a grand jury, he will be held under it. Until then and for that purpose he is remanded to the custody of the marshal of this court, to be allowed liberty upon the renewal of bond for the same amount as at present.

It is so ordered.